UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| **TONY BLEVINS,** | |
| **Plaintiff/Counter-Defendant,** | |
| v. | **Case No.  8:24-cv-00022-DKC** |
| **JOLENE READ,** | **JURY TRIAL DEMANDED** |
| **Defendant/Counter-Plaintiff.** | |

### DEFENDANT/COUNTER-PLAINTIFF JOLENE READ'S
### ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIM

### ANSWER

Defendant Jolene Read, by and through undersigned counsel, hereby answers Plaintiff's Amended Complaint as follows:

### INTRODUCTION

1.      Denied.

2.      Defendant lacks sufficient information to admit or deny the allegations in ¶ 2 and therefore denies the allegations in ¶ 2.

### PARTIES

3.      Defendant is without sufficient information to admit or deny the allegations of ¶ 3 and therefore denies the allegations in ¶ 3.

4.      Admitted.

### JURISDICTION AND VENUE

5.      ¶ 5 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

6.      ¶ 6 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

7.      ¶ 7 states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

8.      Admitted.

## BACKGROUND

9.      Defendant is without sufficient information to admit or deny the allegations of ¶ 9 and therefore denies the allegations in ¶ 9.

10.     Defendant is without sufficient information to admit or deny the allegations of ¶ 10 and therefore denies the allegations in ¶ 10.

11.     Admitted.

12.     Admitted that Plaintiff and Defendant connected on a work-related call.  Admitted that Defendant asked Plaintiff to dinner at some point during Defendant's stay in Maryland.  The remaining allegations are denied.

13.     Admitted that Defendant wore her engagement ring.  It is denied that Defendant knew Plaintiff was married.  Defendant is without sufficient information to admit or deny what Plaintiff knew and therefore denies the remaining allegations in ¶ 13.

14.     Admitted.

15.     Denied.

16.     Denied.

17.     Admitted that Defendant was scheduled to attend a company meeting on the following day.  Defendant is without sufficient information to admit or deny whether Plaintiff was scheduled to attend, and therefore denies the allegation.  The remaining allegations are denied.

18.     It is admitted that Defendant and other co-workers, including Plaintiff, were at Stumpy's Hatchet House at some time  after 5:00 p.m.  The remaining allegations are denied.

19.     It is admitted that the Defendant accepted a ride from Ashley Simmons to her hotel. All other allegations are denied.

20.     Defendant is without sufficient information to admit or deny the first sentence of ¶ 20 and therefore denies the allegations in the first sentence of ¶ 20.  The remaining allegations are denied.

21.     Denied.

22.     Admitted.

23.     Denied.

24.     It is admitted that Plaintiff and Defendant communicated via messages on Apple iCloud Notes application.  The remaining allegations are denied.

25.     Admitted.

26.     It is admitted that Plaintiff and Defendant met in Boston in or about August 2022. All other allegations are denied.

27.     Defendant is without sufficient information to admit or deny the allegations of ¶ 27 and therefore denies the allegations in ¶ 27.

28.     Defendant is without sufficient information to admit or deny the first sentence and therefore denies the allegations in the first sentence.  The remaining allegations are denied.

29.     Defendant is without sufficient information to admit or deny allegations regarding Plaintiff's booking of flight reservations and therefore denies that allegation.  Defendant admits to booking a hotel room in Boston in August 2022.  All other allegations are denied.

30.     Denied.

31.     Admitted that Defendant picked Plaintiff up at the airport.  Defendant is without sufficient information to admit or deny the remaining allegations, and therefore denies the remaining allegations in ¶ 31.

32.     Admitted.

33.     Admitted that Defendant drove Plaintiff to the airport.  All other allegations are denied.

34.     Defendant admits that at times she and Plaintiff communicated with each other after they had been in Boston.  All other allegations are denied.

35.     Admitted that, at some point in time, Defendant discussed her trip with Plaintiff, as well as other co-workers.  All other allegations are denied.

36.     It is admitted that Plaintiff and Defendant had dinner.  Defendant is without sufficient information to admit or deny the location.  All other allegations are denied.

37.     Denied.

38.     Defendant is without sufficient information to admit or deny the first sentence of ¶ 38, or the name of the restaurant referenced in the second sentence, and therefore denies the allegations in the first two sentences of ¶ 38.  Defendant is without sufficient information to admit or deny whether Defendant introduced herself or Plaintiff introduced her, and therefore denies that Plaintiff introduced her.  The remaining allegations are admitted.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Admitted that Plaintiff, Defendant, and other co-workers attended a company sponsored event at the identified location.  The remaining allegations are denied.

43.     Defendant is without sufficient information to admit or deny the allegations of ¶ 43 and therefore denies the allegations of ¶ 43.

44.     It is admitted that Plaintiff relayed to Defendant a conversation he previously had with Mr. Lenhardt.  All other allegations are denied.

45.     It is admitted that Plaintiff and Defendant attended a restaurant in Frederick. Defendant is without sufficient information to admit or deny the name of the restaurant, and therefore denies the allegation relating thereto.  All other allegations are denied.

46.     It is admitted Plaintiff and Defendant had lunch at the Cinco de Mayo Mexican Restaurant and Bar.  It is admitted that Ms. Read returned to New Hampshire later that day.  All other allegations are denied.

47.     It is admitted that, on occasion in the following months, Plaintiff and Defendant communicated as part of their required work duties.  All other allegations are denied.

48.     Defendant is without sufficient information to admit or deny Plaintiff's allegations regarding flight bookings and therefore denies those allegations. All other allegations are denied.

49.     Denied.

50.     Denied.

51.     It is admitted that the sons played Fortnite together.  All other allegations are denied.

52.     Admitted that Plaintiff sent a message via Teams, to which Defendant responded that it was all she could think about, because she had already told Plaintiff she did not want him to come to Boston. As to any remaining allegations, denied.

53.     Admitted that Defendant sent a message to find out if Plaintiff was coming, as she had advised she did not want him to, but he said he would come anyway.

54.     Admitted that Defendant picked up Plaintiff at the airport, but is without sufficient information to admit or deny allegations relating to the time of day, or Plaintiff's prior actions, and therefore denies the remaining allegations in the first sentence.   The remaining allegations are denied.

55.     It is admitted that Defendant did not stay with Plaintiff in Boston.   All other allegations are denied.

56.     Denied.

57.     Denied.

58.     Defendant is without sufficient information to admit or deny the allegations of ¶ 58 and therefore denies the allegations in ¶ 58.

59.     Denied.

60.     Admitted that messages were sent.   All other allegations and characterizations are denied.

61.     Admitted that a message was sent regarding Lenhardt's knowledge, but denied that it was sent via text. As to any remaining allegations, denied.

62.     Admitted that Defendant sent a message to Plaintiff which, among other things, stated that Plaintiff had created an uncomfortable work environment.

63.     Defendant is without sufficient information to admit or deny the allegations of ¶ 63 and therefore denies the allegations in ¶ 63.

64.     Admitted that Defendant had a video call with Ms. Dalton and truthfully reported that a male co-worker had sexually harassed Defendant and been threatening to her.   All other allegations are denied.

65.     Admitted that Defendant stated that her fiancé received threatening messages from someone claiming to be Plaintiff's wife.  All other allegations are denied.

66.     Defendant is without sufficient information to admit or deny the allegations of ¶ 66 and therefore denies the allegations in ¶ 66.

67.     Defendant is without sufficient information to admit or deny the allegations of ¶ 67 and therefore denies the allegations in ¶ 67.

68.     Admitted that Defendant told a person she believed to be Plaintiff's wife these things.

69.     Denied.

70.     Admitted that Defendant filed a complaint against Plaintiff with MainSpring's Human Resources department. Denied that any of Defendant's statements was false.

71.     Denied.

72.     Admitted that Defendant was initially placed on paid administrative leave, which was converted to unpaid leave. Defendant is without sufficient knowledge to admit or deny the allegations as to Plaintiff's situation, and therefore the remaining allegations are denied.

73.     Defendant is without sufficient information to admit or deny the allegations of ¶ 73 and therefore denies the allegations in ¶ 73.

74.     The first sentence of ¶ 74 is admitted.  The remaining allegations are denied.

75.     Denied.

76.     Admitted.

77.     Denied.

78.     Denied.

79.     It is admitted that Defendant identified a picture of her house having been sent to her by the Plaintiff.  All other allegations are denied.

80.     Denied.

81.     Admitted that Defendant was placed on leave.  All other allegations are denied.

82.     Defendant is without sufficient information to admit or deny the allegations in ¶ 82 and therefore denies the allegations in ¶ 82.

83.     Defendant is without sufficient information to admit or deny the allegations in ¶ 83 and therefore denies the allegations in ¶ 83.

84.     Admitted that Defendant contacted the police to inquire whether an e-mail she received was a violation.  The remaining allegations are denied.

85.     Admitted that Plaintiff and Defendant, after negotiation through counsel, entered into a civil agreement.  All other allegations are denied.

86.     Admitted that Plaintiff agreed to enter into the proposed civil agreement and Defendant dismissed her Petition in or about February 2023.  Defendant is without sufficient information to admit or deny the remaining allegations of ¶ 86 and therefore denies the remaining allegations in ¶ 86.

87.     Denied.

88.     It is admitted that Defendant filed a new stalking Petition with New Hampshire Circuit Court, regarding website content and calls received by Defendant, which was granted.  All other allegations are denied.

89.     Admitted.

90.     The first sentence is admitted. Admitted that the police indicated it was not likely a violation. Admitted that Defendant was unhappy with this information. As to the remainder, denied.

91.     Denied.

92.     Denied.

## COUNT I-DEFAMATION

93.     Defendant incorporates responses to ¶¶ 1-92 above as if fully restated.

94.     Denied.

95.     Denied as stated, as the statements are not false and therefore not actionable defamation.  Admitted, however, that statements were provided to Human Resources.  As to any remainder, denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

## AFFIRMATIVE AND OTHER DEFENSES

1.     Plaintiff's claims are barred by qualified privilege.

2.     Plaintiff's claims are barred by absolute privilege.

3.     Without conceding Plaintiff has incurred any damages as a result of the alleged wrongdoing by the Defendant, Plaintiff has failed to mitigate or minimize any alleged damages.

4.     Plaintiff's claim is not actionable because at least some of the alleged statements is not of and concerning Plaintiff.

5.      Plaintiff's claim is not actionable because the alleged statements are true or substantially true.

6.      Plaintiff's claim is not actionable because Plaintiff cannot prove that Defendant was negligent or made the statements with actual malice.

7.      Plaintiff's claim is not actionable because Plaintiff cannot prove that Defendant's actions were the proximate cause of actual damages to Plaintiff.

## DEFENDANT JOLENE READ'S COUNTERCLAIM

Defendant/Counter-Plaintiff Jolene Read, by and through undersigned counsel, hereby asserts this Counterclaim against Plaintiff/Counter-Defendant Tony Blevins, pursuant to Rule 13 of the Federal Rules of Civil Procedure.

## INTRODUCTION

1.      Defendant/Counter-Plaintiff Jolene Read was the victim of a relentless, six-month pursuit by her work colleague and superior Plaintiff/Counter-Defendant Tony Blevins, who was obsessed with carrying on an illicit affair with Ms. Read when all Ms. Read was interested in was a strictly professional relationship.

2.      Mr. Blevins, who was married with a child at the time, would simply not take "no" for an answer as he repeatedly sexually harassed and sexually assaulted Ms. Read, who was engaged to be married at the time to her now-husband.

3.      Mr. Blevins used his senior position as a manager at the company to take advantage of Ms. Read, who remained ever fearful of losing her job, which she desperately needed to support her family.

4.      Although she repeatedly tried to delicately extricate herself from Mr. Blevins's unremitting pursuit by telling him again and again that she was interested in only a professional

relationship, Mr. Blevins simply would not give up until Ms. Read finally filed a workplace complaint and obtained a Stalking Order of Protection against him,

5.      Ms. Read brings this Counterclaim to seek redress for the substantial harm she has endured at the hands of Mr. Blevins.

6.      She asserts claims for defamation and false light invasion of privacy for Mr. Blevins's false and defamatory statements to co-workers, Ms. Read's family, and the general public through a website he created in which he falsely claimed, among other things, that Ms. Read was having an affair with him, loved him, and was unhappy at home with her fiancé. As Mr. Blevins knew, none of this was true.

7.      Mr. Blevins even went so far as to obtain the URL "joleneread.com," without Ms. Read's knowledge or consent, that he then linked to his own website, tonyblevins.com.

8.      She asserts claims for publication of private facts and intrusion upon seclusion because Mr. Blevins, without Ms. Read's knowledge or consent, accessed her personal cellphone and cloud storage where he obtained and transferred personal, intimate photos of Ms. Read (meant only for her fiancé) that he shared with work colleagues, in a shameful breach of Ms. Read's privacy.

9.      She asserts a claim for breach of contract as a result of Mr. Blevins's failure to abide by the terms of a settlement agreement following the Stalking Order of Protection by continuing to communicate with Ms. Read after promising to have "zero contact" with her, and failing to delete personal photos of her and even going so far as to post one of them on his website.

10.      Finally, and perhaps most importantly, she asserts claims for battery and false imprisonment as a result of Mr. Blevins's sexual assault of Ms. Read by engaging in unconsented to sexual intercourse with her on multiple occasions, when he pinned her to a hotel room bed, tore

off her clothes, forced himself upon her without protection, ignored her pleas to stop, and prevented her from leaving.

11.     As a result of Mr. Blevins's outrageous conduct, Ms. Read has suffered deep emotional distress, humiliation, mental anguish, physical injury, reputational damage, and harm to her overall well-being, as well as economic losses.

12.     The purpose of this Counterclaim is to hold Mr. Blevins accountable and compensate Ms. Read for the considerable harm that he has caused.

## PARTIES

13.     Defendant/Counter Plaintiff Jolene Read resides at 146 Hunt Hill Road, Rindge, New Hampshire, 03461.

14.     Plaintiff/Counter-Defendant Tony Blevins resides at 22748 Autumn Breeze Avenue, Clarksburg, MD 20871.

## JURISDICTION AND VENUE

15.     The above captioned action was initially filed by Mr. Blevins in the Circuit Court for Montgomery County, Maryland.

16.     On the basis of diversity jurisdiction, Ms. Read filed a notice of removal of this action from the Circuit Court for Montgomery County, Maryland to this Court on January 4, 2024.

17.     Mr. Blevins filed an Amended Complaint in this court on January 26, 2024.

18.     Jurisdiction is proper in that Mr. Blevins filed an Amended Complaint in this matter, consented to the personal jurisdiction of this court, and the Counterclaim arises out of the same transaction or occurrences as asserted in the Amended Complaint. *See* 28 U.S.C. § 1367(a); Fed. R. Civ. Proc. 13.

19.     Venue is proper as the matter was properly removed and  Mr. Blevins subsequently chose to litigate in this court via the Amended Complaint.

## FACTS COMMON TO ALL CLAIMS

20.     Both Mr. Blevins and Ms. Read were employed by MainSpring, Inc. (hereinafter "MainSpring"), an IT strategy and consulting firm located in Frederick, Maryland.

21.     Mr. Blevins began his employment in June 2007 and, during the timeframe of the events described below, served as the Professional Services Manager until his employment ended in March 2023.

22.     Mr. Blevins's role included managing all aspects of the Managed Services Division and personnel dedicated to delivering technology solutions for client companies.

23.     Ms. Read began her employment with MainSpring as a Virtual Chief Information Officer in or around November of 2021. Ms. Read acted as a consultant for clients regarding risks and investment opportunities.

24.     Ms. Read worked almost entirely remotely, and lived in New Hampshire during her employment with MainSpring.

25.     Mr. Blevins was not Ms. Read's direct manager, but did oversee aspects of her work in his managerial capacity.

26.     On information and belief, as a manager, Mr. Blevins had administrative control over and access to Ms. Read's computer, which allowed him to view her screen and interact with any accounts which she had logged into, including her personal email as well as her personal cloud storage that contained personal photos and other personal information.

27.     Throughout the parties' employment, Mr. Blevins and Ms. Read communicated via Microsoft Teams on multiple occasions regarding work matters. They also occasionally engaged in personal conversations regarding their families and personal lives.

28.     Ms. Read was encouraged by her direct supervisor, Jeremy Keikko, and other executive team members, such as Ray Steen and Tom Keller, to communicate with and spend time with co-workers in a personal capacity.

29.     Ms. Read was also required by MainSpring to travel to Maryland for work, roughly once per quarter. During her trips to Maryland, she often reached out to multiple co-workers to inquire if they wished to have dinner while she was in town.

30.     MainSpring pushed team-building events, which were often held when Ms. Read was in town to encourage her to interact with and befriend co-workers.

31.     MainSpring also held daily "huddles" where employees were asked at the start of each huddle to share something going on in their personal life.

32.     During these team huddles, Ms. Read shared information and updates about her fiancé (now husband), her son, and other personal aspects of her life.

<u>Maryland Trip in July 2022</u>

33.     Ms. Read was set to travel to Maryland for one of her quarterly trips from July 21 to July 23, 2022.

34.     On or around July 21, 2022, Ms. Read communicated with Mr. Blevins via Microsoft Teams on a work-related call. During the call, Ms. Read notified Mr. Blevins that she would be in the Frederick area, where MainSpring was based, on July 21, 2022 and asked if Mr. Blevins would like to have dinner at some point while Ms. Read was to be in town.

35.     Mr. Blevins agreed to have dinner and offered to drive Ms. Read.

36.     During dinner, Ms. Read and Mr. Blevins engaged in conversation about their personal lives and work matters.

37.     After dinner, Mr. Blevins drove Ms. Read to her hotel. Mr. Blevins said he needed to use the restroom. Ms. Read told Mr. Blevins that she did not believe there was a restroom in the hotel lobby and offered to let Mr. Blevins use the bathroom in her hotel room. After Mr. Blevins used the bathroom, the parties briefly spoke in Ms. Read's room before going back downstairs where Ms. Read walked Mr. Blevins out of the hotel and towards the parking lot. Once outside, the parties hugged goodbye and Mr. Blevins then attempted to kiss Ms. Read. Ms. Read was unsure how to respond as she was slightly inebriated from alcoholic beverages she consumed at dinner. However, Ms. Read did not kiss Mr. Blevins. Mr. Blevins then left. After the kissing incident, Ms. Read believed that the kiss from Mr. Blevins was an accident after both of them had had too much to drink at dinner.

38.     On July 22, 2022, MainSpring management and executive team had scheduled an after-hours team-building event at Stumpy's Alehouse in Frederick, Maryland.

39.     Earlier in the day, at or around 2:00 p.m., Ms. Read and her coworker Ray Steen went to two different bars in the Frederick area for drinks. The rest of their co-workers, including Mr. Blevins, joined around 5:00 p.m. After others joined, it was decided that it was time to go to Stumpy's.

40.     Ms. Read communicated with the group that she was not familiar with the area and asked for directions. Mr. Blevins then offered Ms. Read a ride. During the event, Ms. Read and others consumed multiple alcoholic beverages.

41.     At the end of the event, there was some leftover beer. Ms. Read offered to take some of it back to her hotel.

42.     Co-worker Ashley Simmons drove Ms. Read back to her hotel. When they arrived at the hotel, they sat in Ms. Simmons's car in the parking lot and spoke for an hour or so. While talking with Ms. Simmons, Ms. Read consumed some of the beer which she had brought back from the event. After talking with Ms. Simmons for an hour or so, Ms. Read was intoxicated and stated to Ms. Simmons that she needed to go to her room to use the restroom. Ms. Simmons left at this point.

43.     Shortly after returning to her hotel room, Ms. Read heard a knock on her hotel room door. She opened the door and saw that it was Mr. Blevins. Mr. Blevins came into the room and pushed her onto the bed.

44.     Ms. Read was not interested in having any type of physical interaction with Mr. Blevins. However, Mr. Blevins continued making physical, sexual advances on Ms. Read. As Mr. Blevins persisted, Ms. Read said, "Please don't." She also mentioned that she was having her period as a way to try to dissuade Mr. Blevins from proceeding further.

45.     Ignoring Ms. Read's requests to stop what he was doing, Mr. Blevins removed Ms. Read's clothes, got on top of Ms. Read on the hotel-room bed, and proceeded to engage in sexual intercourse with Ms. Read without her consent and without any type of protection from sexually transmitted disease or pregnancy, such as a condom.

46.     Although after this encounter, Ms. Read wanted to report Mr. Blevins's sexual assault to MainSpring and authorities, Ms. Read was very concerned about the impact of doing so would have on her employment.

47.     At the time, Ms. Read, her son, and her fiancé relied entirely on her income for support and she could not afford to lose her job and accompanying health insurance.

48.     Ms. Read knew that Mr. Blevins was a senior manager at MainSpring with a close relationship with its senior executives.

49.     Ms. Read was also concerned about the impact reporting Mr. Blevins's actions would have on her reputation and was embarrassed and humiliated by what happened.

50.     As a result, she reluctantly decided to stay silent.

51.     However, Ms. Read, who was engaged to be married at the time to her now-husband, was not interested in having any type of romantic or sexual relationship with Mr. Blevins.

52.     Out of concern for maintaining her employment, after her July 2022 Maryland trip, Mr. Read tried to maintain a strictly working relationship with Mr. Blevins. Although Mr. Blevins sent many unwanted personal messages to Ms. Read, she attempted to politely respond to them as to not anger or offend Mr. Blevins.

53.     Mr. Blevins regularly made comments about his tenure with the company, how personally and professionally close he was with the executive team, and how important his role was at the company. Mr. Blevins also spoke about the influence he held over individuals at the company, including Ms. Read's direct supervisor Mr. Keikko. Mr. Blevins made comments about how Mr. Keikko and he were very close personally and professionally.

<u>First Boston Trip</u>

54.     Later that summer, Mr. Blevins communicated to Ms. Read that he did not want to wait until her next trip to Maryland to see her. Mr. Blevins suggested that he come to Boston for a day trip.

55.     Since Ms. Read was not interested in anything other than a professional relationship with Mr. Blevins, she did not want him to come to Boston to see her for what she thought would be a personal trip by him.

56.     Despite Ms. Read's efforts to dissuade Mr. Blevins from coming to Boston, Mr. Blevins insisted that he would come to Boston. A "day hotel" was booked for the trip.

57.     Resigned to the fact that Mr. Blevins would come to Boston no matter what she said, Ms. Read felt at this point that her best chance to get Mr. Blevins to discontinue his romantic interest in her was to communicate with him in person while he was there.

58.     On August 26, 2022, Ms. Read picked Mr. Blevins up from the airport and drove him to his hotel.

59.     Once in the hotel room, he tried to hug her but she resisted and pulled away from him.

60.     Ms. Read then left the room for a cigarette, hoping Mr. Blevins would settle down.

61.     When she returned to the room, Mr. Blevins again forced himself on her.

62.     The more she resisted, the more forceful he became.

63.     Ms. Read was scared and concerned about her physical safety if she continued resisting.

64.     Mr. Blevins was considerably bigger and stronger than Ms. Read, making it exceedingly difficult for Ms. Read to fend off Mr. Blevins's advances.

65.     After forcing Ms. Read onto the bed, Mr. Blevins climbed on top of her, removed her clothes, and again sexually assaulted her, engaging in sexual intercourse with her without her consent and, again, without any type of protection against sexually transmitted disease or pregnancy, such as a condom.

66.     After climaxing, Mr. Blevins got off Ms. Read to use the restroom at which point Ms. Read immediately got dressed.

67.     Although Ms. Read was very upset by Mr. Blevins's sexual assault and wanted to seek help and safety, she was again concerned about jeopardizing her position with MainSpring.

68.     As a result, she suggested they get something to eat to get out of the hotel room and into a public space.

69.     During their meal, Ms. Read engaged in small talk with Mr. Blevins to avoid upsetting him.

70.     Ms. Read then drove Mr. Blevins to the airport.

71.      While in the car, she tried to make clear to him that she was not interested in a romantic or sexual relationship with Mr. Blevins.

72.     Mr. Blevins did not seem interested in what Ms. Read was saying as he continued to speak over her and change the subject.

73.     Mr. Blevins's attitude scared Ms. Read, making her fear for her well-being.

74.     Following the Boston trip, Ms. Read tried repeatedly in her communications with Mr. Blevins to blunt his advances. She told him that she did not think they should see each other outside of work and tried repeatedly to end their non-work-related communications.

75.     Mr. Blevins, however, ignored Ms. Read's comments.

76.     As a result, Ms. Read again felt scared for her well-being as well as the security of her job if she were to upset or offend Mr. Blevins due to his tenure and position at MainSpring.

Maryland Trip in October 2022

77.     Ms. Read was next scheduled to visit Maryland for work from October 17 to October 22, 2022.

78.     In the weeks leading up to her trip, Mr. Blevins communicated a desire to see Ms. Read during her visit to Maryland.

79.     Because Ms. Read had been unsuccessful during their telephone and electronic messages in stopping Mr. Blevins's personal advances, Mr. Read hoped that she could do this during an in-person conversation with him over dinner.

80.     Thus, on October 17, 2022, Mr. Blevins picked Ms. Read up for dinner at her hotel. After dinner, Mr. Blevins drove Ms. Read back to her hotel. Although she did not invite him to her room or into the hotel, Mr. Blevins nevertheless parked the car and began walking to the hotel before Ms. Read could say anything.

81.     Because Ms. Read was afraid to reject Mr. Blevins in the hotel lobby, in a public setting where it might anger or embarrass him, she allowed him to come to her room.

82.     Once in her room, Mr. Blevins grabbed Ms. Read and attempted to push her onto the bed.

83.     Ms. Read actively fought Mr. Blevins off while asking him to get off of her. Mr. Blevins, however, ignored Ms. Read's protests and continued smiling while trying to take off her blazer and ripping at her shirt. Mr. Blevins got on top of Ms. Read, holding her down with his arms so that she could not move her legs. Because Ms. Read was considerably stronger than Ms. Read, Ms. Read was scared and felt helpless.

84.     At this point, Ms. Read screamed, "Get off of me, I mean it." Mr. Blevins finally stopped.

85.     Ms. Read then moved away from Mr. Blevins, but was scared that he was going to hurt her and stop her from leaving the hotel room. She told him: "I don't want to be your mistress. I don't want to do this. Please don't be mad, but I can't." Mr. Blevins remained silent. Although Mr. Blevins again tried to kiss Ms. Read, she resisted and asked him to leave, which he did.

86.     Ms. Read immediately called her friend Melissa to tell her what had happened.

87.    The next morning, Mr. Blevins messaged Ms. Read to tell her how much he enjoyed the previous evening.

88.    This was extremely upsetting to Ms. Read. Ms. Read believed that despite having screamed at Mr. Blevins and having physically fought him off, he was going to continue to pursue her. She still feared that if she were to deny him and upset him, she would jeopardize her employment and/or her and her family's safety.

89.    Ms. Read felt trapped and that the only way to ensure her safety and continued employment was to attempt to appease Mr. Blevins in some manner.

90.    During her week-long stay in Maryland, Ms. Read saw Mr. Blevins again for dinner on October 19, 2022.

91.    During dinner Mr. Blevins suggested that they share a bottle of wine. Ms. Read responded that she did not like wine and the way it made her feel.

92.    Mr. Blevins became upset about her unwillingness to share a bottle of wine with him. To avoid antagonizing Mr. Blevins, Ms. Read drank the wine along with other alcoholic beverages at dinner.

93.    After dinner, Ms. Read attempted to tell Mr. Blevins once again that she was not interested in a romantic or sexual relationship with him and wanted their interactions to be strictly professional.

94.    As Mr. Blevins drove Ms. Read back to her hotel, Mr. Blevins became very upset and began driving increasingly erratically. He sped up to approximately 120 MPH on the highway and swerved in and out of traffic.

95.    Ms. Read felt very scared for her life and trapped.

96.     When they finally arrived at Ms. Read's hotel, she was shaken from Mr. Blevins's reckless driving and also felt intoxicated from the wine and other alcoholic beverages that Mr. Blevins insisted that she drink at dinner.

97.     Mr. Blevins took advantage of her inebriated condition and sexually assaulted Ms. Read in her hotel room by, once again, engaging in non-consensual, sexual intercourse with her, without any type of protection, when she was barely conscious.

98.     On the final day of Ms. Read's trip to Maryland, Mr. Blevins asked to meet her for lunch. During the meal, Mr. Blevins commented on how little Ms. Read ate during their meals together. Her lack of appetite, however, was due to fear and anxiety associated with Mr. Blevins's unwanted, relentless advances toward her. Ms. Read sat in silence during most of this meal.

99.     During the meal, Ms. Read went to the restroom, leaving her personal cellphone, wallet, and keys on the table.

100.    When she came out of the restroom, she saw Mr. Blevins walking back from the men's room holding her personal belongings.

101.    Unbeknownst to Ms. Read at the time, Mr. Blevins, on information and belief, used this opportunity to access Ms. Read's personal cellphone without her consent and, while doing so, to view and transfer copies of personal, intimate photographs of Ms. Read in various stages of undress that she had taken for and shared with her fiancé.

102.    Mr. Blevins's actions reflected a serious invasion of Ms. Read's privacy, which she later discovered when Mr. Blevins circulated these personal, intimate photographs to other MainSpring employees.

103.    As they were leaving the restaurant, Mr. Blevins asked Ms. Read to sit in his car to talk. Ms. Read agreed as the car was parked in a public space and there was still daylight.

104.    After talking for a few minutes, Ms. Read told Mr. Blevins that she needed to leave to begin her long drive back to New Hampshire. Mr. Blevins pulled her in and kissed her. She pulled away and said she needed to go. She left his vehicle and walked to her vehicle. Mr. Blevins followed her and blocked the door to her car. She repeated that she needed to go while he stood there blocking her door. He eventually allowed her to get into the car and shut her door.

105.    As she drove away, Mr. Blevins began following her in his car for several miles.

106.    In the subsequent months, Ms. Read remained seriously concerned about the possibility of Mr. Blevins's jeopardizing her continued employment at MainSpring in response to her rebuffing his personal advances. Thus, she tried to act cordial and professional with Mr. Blevins during their work interactions while reiterating that she was not interested in a personal, romantic relationship with him when the subject arose.

107.    Much to her dismay, however, Mr. Blevins began inserting himself more and more into Ms. Read's work. He began joining calls with her clients, and looping himself into client emails unnecessarily. Ms. Read felt that he was trying to intimidate her by showing her how easily he could take control of her work.

108.    Mr. Blevins began talking to Ms. Read about building a life with her, about leaving his wife and son for her, and about wanting to have children with her.

109.    Ms. Read responded that she was not interested in these things and that they were a bad idea.

110.    Ms. Read remained scared that she would lose her job if she disappointed Mr. Blevins. She also felt from his prior erratic behavior that her and her family's safety were at risk if she disappointed or upset Mr. Blevins.

Second Boston Trip

111.    In 2022, Mr. Blevins told Ms. Read that he wanted to come to Boston for a weekend in early December 2022 to visit her.

112.    Mr. Blevins knew from prior work conversations that Ms. Read would occasionally make weekend trips to visit her friend Melissa who lived on Martha's Vineyard. Mr. Blevins suggested that Ms. Read tell her fiancé, with whom she was living, that she was going to visit Melissa for a weekend, but instead meet him in Boston.

113.    Although Ms. Read told Mr. Blevins that she did not want to see him in Boston, Mr. Blevins insisted on coming anyway.

114.    On the date of Mr. Blevins arrival, December 2, 2022, Ms. Read reached out to her friend Melissa who had been aware of the ongoing problem with Mr. Blevins. Ms. Read and Melissa agreed that Ms. Read would pick Mr. Blevins up from the airport and that Ms. Read would be direct with him to try to end his unwanted pursuit of her. Ms. Read further decided that she would have a hotel room ready for Mr. Blevins to stay in for the weekend, by himself. After Ms. Read told him firmly to stop his relentless pursuit of her, she would leave him at the hotel and go to Melissa's house on Martha's Vineyard.

115.    On December 2, 2022, Ms. Read picked up Mr. Blevins from the airport in Boston. In the car-ride to the hotel, Ms. Read told Mr. Blevins that she was scared, could not continue to "do this," and wanted to only be co-workers. Mr. Blevins did not respond.

116.    When they arrived at Mr. Blevins's hotel room, Ms. Read told Mr. Blevins that she would not stay for the weekend with him. Mr. Blevins responded by grabbing her and hugging her, refusing to let her go. She told him "no" and tried to put space between them.

117.    As in past encounters, Mr. Blevins forced Ms. Read onto the bed and tried to make her lie down. Ms. Read felt that Mr. Blevins was refusing to hear anything she was saying.

118.     She fought back and got up from the bed.

119.     Mr. Blevins grabbed her again and pulled her back to the bed.

120.     Ms. Read kept telling Mr. Blevins that she was not interested in a romantic relationship or sexual interaction with him.

121.     Eventually, Mr. Blevins released her, but asked her not to leave because he loved her.

122.     Ms. Read, who did not love Mr. Blevins and was not interested in a romantic relationship or sexual interaction with him, said she was leaving and going to Melissa's home, whose address Ms. Read knew Mr. Blevins did not know.

123.     Ms. Read walked quickly to the door of the hotel room. Mr. Blevins responded in an angry voice, asking if she was really leaving.

124.     As Ms. Read left the hotel room, Mr. Blevins ran after her.

125.     At this point, Mr. Blevins threatened that he would hurt himself if Ms. Read left him "alone with his thoughts." Ms. Read responded that she had paid for the hotel for the weekend and he should enjoy the weekend. She said, "I told you not to come, but I really need to leave."

126.     She then ran to the elevator. Mr. Blevins chased after her. Mr. Blevins got ahead of Ms. Read when they approached the elevator and stood between Ms. Read and the elevator, blocking her escape.

127.     When the elevator arrived, Ms. Read was able to stick her foot out to keep the door from closing.

128.     Ultimately, Mr. Blevins allowed Ms. Read to enter the elevator, but threw a gift he was holding into the elevator before storming away.

129.     During the following work week, Mr. Blevins continued to try to communicate with Ms. Read through Teams. She was polite, but stopped responding to Mr. Blevins's messages about anything other than work. Mr. Blevins sent many long inappropriate messages to Ms. Read to which she responded by telling him they were inappropriate. She insisted that they communicate only about work.

130.

131.     On December 7, 2022, Mr. Blevins told Ms. Read that their co-worker Mr. Lenhardt "knows" about their history. This upset Ms. Read, because she did not know what Mr. Blevins had told and would tell co-workers about her interactions with him. She felt that his actions were another attempt to force her into non-work-related communication with him. In response, Ms. Read stated that he was making their work environment uncomfortable.

<u>Blevins Makes False and Defamatory Statements to Read's Fiancé</u>

132.     On information and belief, on or about December 9, 2022, Mr. Blevins, posing as his wife, sent a message to Ms. Read's fiancé via Facebook Messenger in which he made false and defamatory statements about an alleged affair between Mr. Blevins and Ms. Read.

133.     Among other things, Mr. Blevins, posing as his wife, made the following false and defamatory statements about Ms. Read to her fiancé:

a.   That Ms. Read was cheating on her fiancé and involved in an "affair" with Mr. Blevins "for at least 6 months and possibly longer";

b.   That "things look to be serious between them"; and

c.   That they had been "talking about wanting to move in together" and that she "is afraid of being caught before they are ready."

134.    In fact, Ms. Read was not involved in an "affair" with Mr. Blevins, but was the victim of repeated sexual harassment and assault. Ms. Read had never talked with Mr. Blevins about wanting to move in with him.

135.    Mr. Blevins knew that these statements were false when he sent them and he sent them to cause harm to Ms. Read's relationship with her fiancé, her reputation, and her overall well-being.

136.    On information and belief, in a subsequent message, Mr. Blevins, posing as his wife, in a Facebook Messenger message falsely referred to Ms. Read as having sent "nude and mostly nude pictures" to Mr. Blevins. He then forwarded copies of these intimate photos of Ms. Read.

137.    Ms. Read found this shocking and incredibly upsetting as she had never shared "nude and mostly nude pictures" of herself with Mr. Blevins. She also did not know with whom Mr. Blevins had shared these photos, including whether he had shown them to their MainSpring co-workers.

138.    Although she had privately shared intimate photos with her fiancé, Mr. Blevins had surreptitiously obtained copies of these private, intimate photos of Ms. Read without Ms. Read's knowledge or consent and in violation of her privacy.

Human Resources Complaint

139.    On December 9, 2022, Ms. Read called MainSpring's Human Resources Manager Theresa Dalton and made a complaint regarding the behavior of a "co-worker." Although she was referring to the actions of Mr. Blevins, she did not identify him during the call.

140.     Mr. Blevins subsequently called Ms. Dalton and Tom Keller, the President and Chief Operating Officer of MainSpring, and falsely stated that he and Ms. Read were having an affair.

141.     Thereafter, Mr. Blevins submitted a statement to MainSpring management that contained false and defamatory statements about Ms. Read.

142.     Mr. Blevins's statement to MainSpring management contained copies of the intimate photos that Mr. Blevins had surreptitiously taken from Ms. Read's personal cellphone and/or personal cloud storage without her knowledge or consent.

143.     On information and belief, Mr. Blevins had also used his computer administrative privileges for MainSpring's computer system to access Ms. Read's personal cloud storage from which he downloaded private, intimate photos of Ms. Read without her knowledge or consent.

144.     On information and belief, Mr. Blevins showed these intimate photos of Ms. Read to MainSpring co-workers without her knowledge or consent and in a serious invasion of her privacy.

145.     On December 11, 2022, Mr. Blevins emailed false and defamatory statements about Ms. Read to her fiancé. Among other things, Mr. Blevins falsely stated or implied that:

   a.   He and Ms. Read had been involved in a consensual affair.

   b.   Ms. Read's claims to him and to MainSpring's human resources department that she was a victim of sexual harassment and sexual assault by Mr. Blevins were a "lie."

   c.   Ms. Read had told him that "things were not good in your home," "she was not happy," he and Ms. Read's son do not get along, and he does not treat her son well.

146.     These and other statements to Ms. Read's fiancé were false and defamatory and were made by Mr. Blevins knowing that they were false. Mr. Blevins made these false and

defamatory statements about Ms. Read to Ms. Read's fiancé to destroy Ms. Read's relationship with her fiancé, to injure her reputation, and to cause her emotional distress and mental anguish.

147.    On December 12, 2022, Ms. Read filed a formal complaint with MainSpring's Human Resources Manager Theresa Dalton regarding Mr. Blevins's behavior.

148.    On December 14, 2022, Ms. Read filed a Stalking Petition against Mr. Blevins in New Hampshire Circuit Court in response to Mr. Blevins's ongoing sexual harassment and physical attacks on her. In response, the New Hampshire court entered a Temporary Order of Protection against Mr. Blevins and set a hearing on Ms. Read's Petition for January 11, 2023, although the hearing was continued until February 15 , 2023.

149.    On January 6, 2023, Ms. Read received a notification that someone had attempted to start an OnlyFans website account under her name and email.

150.    According to Wikipedia, OnlyFans is an "internet content subscription service…used primarily by sex workers who produce pornography."

151.    On information and belief, Mr. Blevins had attempted to create the OnlyFans page to publicly disseminate the intimate photos of Ms. Read that he had obtained without her knowledge or consent and to cause further injury to Ms. Read, in retaliation for rejecting his sexual advances.

Blevins Breaches Settlement Agreement

152.    While awaiting the hearing on Ms. Read's stalking Petition, on February 8, 2023, Ms. Read and Mr. Blevins entered into a settlement agreement ("Settlement Agreement"), a true and correct copy of which is attached as Exhibit 1.

153.    Section I(a) of the Settlement Agreement states: "The Parties agree that they shall have zero contract with each other, either directly or through third parties, except as expressly provided by this Agreement."

154.    Section I(c) of the Settlement Agreement prohibits "correspondence of a personal nature" between them.

155.    Section II(c) of the Settlement Agreement states: "The Parties agree to permanently delete any private photographs, video, or any other media of the other."

156.    Upon execution of the Settlement Agreement, Ms. Read agreed to withdraw her pending Stalking Petition.

157.    On March 12, 2023, Ms. Read searched her name on the Internet and discovered two publicly accessible websites with the URLs, joleneread.com and tonyblevins.com. Accessing the URL joleneread.com automatically transferred a user to the home page of the website tonyblevins.com, which was titled: "Jolene Marie Read: Our Story Could/Should Have Been Different." Below the title was a picture of Mr. Blevins and Ms. Read together.

158.    Mr. Blevins obtained the URL joleneread.com and created this website without Ms. Read's knowledge or consent, and in violation of the Settlement Agreement.

159.    A true and correct copy of the homepage of Mr. Blevins's website appears below:



160.    A section of the website consisted of an "Open Letter" to Ms. Read, in direct violation of the Settlement Agreement, which prohibited "direct communication" between the parties (other than "work correspondence") and "correspondence of a personal nature," and mandated "zero contact with each other."

161.    The website contained numerous false and defamatory statements about Ms. Read, including the following:

    a.   That they had engaged in a "several months-long affair";

    b.   That Ms. Read had said that she wasn't "happy at home," that her son wasn't happy and wasn't treated well by her fiancé, and that she was "ready for a change," falsely

implying that Ms. Read was unhappy in her relationship with her fiancé and looking to end that relationship;

c. That Ms. Read had lied in her statement to MainSpring's human resources in which she reported Mr. Blevins's ongoing sexual harassment and improper conduct;

d. That Ms. Read had lied to Mr. Blevins in her communications with him and that she had made statements in a "private chat" that contradicted her complaint to MainSpring's human resources;

e. That Ms. Read was the source of "embarrassment, heartache and grief" for Mr. Blevins and that Ms. Read had not been honest in her communication with Mr. Blevins about their "relationship"; and

f. That Mr. Blevins had "let [his] guard down, [a]nd then [Ms. Read] pulled the rug" and that Ms. Read had "loved" Mr. Blevins.

162. Mr. Blevins posted these false and defamatory statements that he knew to be false on a publicly accessible website where they could be seen by anyone, including their MainSpring co-workers and Ms. Read's friends and family members, including Ms. Read's fiancé and son.

163. Mr. Blevins's actions in creating this website caused serious injury to Ms. Read's reputation as well as humiliation and mental anguish.

164. Mr. Blevins possession and posting of the photo that appeared on the home page of the website violated the Settlement Agreement in which he agreed to delete any private photographs, video, or any other media of Ms. Read.

165. On March 13, 2023, Ms. Read notified MainSpring's Human Resources of Mr. Blevins's website, Mr. Blevins's other inappropriate behavior, and Mr. Blevins's violation of the Settlement Agreement.

166. On March 13, 2023, Ms. Read also filed a renewed Stalking Petition against Mr. Blevins with the New Hampshire Circuit Court, and was granted a Stalking Temporary Order of Protection against Mr. Blevins.

167. On March 17, 2023, Mr. Blevins employment with MainSpring terminated. On information and belief, MainSpring gave Mr. Blevins the opportunity to resign or otherwise face termination of his employment.

## COUNT I-DEFAMATION

168. Ms. Read repeats and realleges the allegations in paragraphs 1 through 167 of this Counterclaim as if fully set forth in this Count.

169. Mr. Blevins disseminated false and defamatory statements about Ms. Read to Ms. Read's employer at the time, MainSpring, as well as to her co-workers, family members, and the general public by falsely stating that they had been in a consensual romantic relationship.

170. Specifically, Mr. Blevins made the following false statements:

a. On or around December 9, 2022, Mr. Blevins communicated to MainSpring's President Tom Keller and MainSpring's Human Resource Manager Theresa Dalton that he and Ms. Read had been involved in an "affair" and that Ms. Read had been untruthful in reporting to MainSpring's Human Resources department that she had been sexually harassed, sexually assaulted, and threatened by Mr. Blevins.

b. On December 9, 2022, Mr. Blevins, posing as his wife, published false and defamatory statements about Ms. Read to Ms. Read's fiancé, including that Ms. Read had been engaged in an affair with Mr. Blevins, had been cheating on her fiancé for at least six months, that Mr. Blevins and Ms. Read were in a serious relationship, that Ms. Read

had talked about wanting to move in with Mr. Blevins, and that Ms. Read was "afraid of being caught."

c.   Mr. Blevins had published numerous false and defamatory statements on the Internet where they were accessible by the general public on a website he created with the URLs tonyblevins.com and joleneread.com. Specifically, Mr. Blevins falsely stated that:

  i.   Ms. Read had "made up those lies" in her report about him to MainSpring HR;

  ii.   The "details of our private [online] chat are in stark contrast to the details in your statement" to Human Resources;

  iii.   Ms. Read is a liar by wondering whether "there was truth in anything you shared";

  iv.   Ms. Read had told him that she "[wasn't] happy at home," that her son "wasn't happy and wasn't treated well" by her fiancé at the time and now-husband, and that she was "ready for a change"; and

  v.   He was in a "several-months long affair" with Ms. Read.

d.   On or around December 11, 2022, Mr. Blevins sent an email to Ms. Read's fiancé in which he falsely stated that:

  i.   Mr. Blevins and Ms. Read were having an "affair"; and

  ii.   Ms. Read's accusations of sexual assault against Mr. Blevins were "horrifying accusations …that are completely false."

171.   Mr. Blevins's false and defamatory statements about Ms. Read to her employer, co-workers, family, and the general public were made by Mr. Blevins with actual malice—that is, with knowledge that they were false or with reckless disregard for the truth.

172.     In the alternative, some or all of the false and defamatory statements that Mr. Blevins disseminated about Ms. Read to her employer, co-workers, family, and the general public were made with at least negligence or a greater degree of fault.

173.     As a direct and proximate result of Mr. Blevins's false and defamatory statements about her, Ms. Read has sustained serious injury to her reputation, her career, her familial relationships, and her overall well-being.

174.     As a direct and proximate cause of Mr. Blevins's false and defamatory statements, Ms. Read has suffered damages in the form of lost income, emotional distress, mental anguish, humiliation, pain and suffering, public embarrassment, and such other damages as may be proven at trial.

175.     Mr. Blevins knowingly disseminated false and defamatory statements about Ms. Read to her employer, her fiancé, her co-workers, and the general public with the intention of harming Ms. Read's reputation and causing her severe emotional distress and mental anguish.

176.     Mr. Blevins acted with common-law malice and ill will against Ms. Read in knowingly disseminating false and defamatory statements about Ms. Read to cause injury to her in response to Ms. Read's rejection of Mr. Blevins's advances and desire to have a romantic relationship with her.

## COUNT II

### False Light Invasion of Privacy

177.     Ms. Read repeats and realleges the allegations in paragraphs 1 through 176 of the Counterclaim as if set forth in this Count.

178.     By publishing false and defamatory statements about Ms. Read, including but not limited to the false and defamatory statements discussed above, Mr. Blevins gave publicity to matters concerning Ms. Read that placed her in a false light before a large number of recipients.

179.    In particular, Mr. Blevins created a public website, accessible from the URLs joleneread.com and tonyblevins.com, on which he published numerous false and defamatory statements about Ms. Read, placing Ms. Read in a false light that would be highly offensive to a reasonable person.

180.    Mr. Blevins falsely claimed that he and Ms. Read had been engaged in a "several months-long affair," that she was cheating on her fiancé, that Ms. Read wasn't happy at home with her fiancé, and that she was "ready for a change."

181.    Mr. Blevins falsely claimed that Ms. Read had lied in her complaint against Mr. Blevins to MainSpring that he has sexually harassed her and engaged in other misconduct and that her private messages to him contradicted her statements to MainSpring.

182.    Mr. Blevins falsely claimed that Ms. Read had not been honest in her communications with Mr. Blevins about their "relationship," that she had misled him, and that she had loved him.

183.    Mr. Blevins had obtained the URL joleneread.com without Ms. Read's knowledge or approval.

184.    Mr. Blevins published the false information about Ms. Read to a wide audience on a website that could be accessed by anyone with an Internet connection and that could be easily found by simply searching Ms. Read's name on the Internet.

185.    Mr. Blevins knew that the statements about Ms. Read were false or acted with reckless disregard as to the statements' truth or falsity and the false light in which Ms. Read was placed.

186.    As a result of Mr. Blevins's actions, Ms. Read suffered damages, including injury to her reputation, emotional distress, mental anguish, financial loss, and harm to her overall well-

being.

187.    Moreover, Mr. Blevins placed Ms. Read in a false light before the public with the intention of causing harm to Ms. Read and causing her severe emotional distress and mental anguish.

188.    Mr. Blevins acted with common-law malice and ill will toward Ms. Read in placing her in a false light and causing her injury in response to Ms. Read's rejection of Mr. Blevins's advances and desire to have a romantic relationship with her.

**<u>COUNT III</u>**

**Publication of Private Facts**

189.    Ms. Read repeats and realleges the allegations in paragraphs 1 through 188 of the Counterclaim as if set forth in this Count.

190.    In creating the website about Ms. Read that was accessible by anyone with an Internet connection, Mr. Blevins gave unreasonable publicity to information about Ms. Read's private life.

191.    Mr. Blevins published private information about Ms. Read on the public website he created.

192.    Mr. Blevins disseminated intimate private photos of Ms. Read to colleagues at MainSpring and others that he obtained without Ms. Read's knowledge or consent from her personal cellphone and her personal cloud storage.

193.    The private information about Ms. Read and the private intimate photos of Ms. Read that Mr. Blevins publicly disseminated to others were not of valid public concern.

194.    Mr. Blevins's public dissemination of this private information and the intimate photos of Ms. Read without her knowledge or consent would be highly offensive to a reasonable person.

195.     Mr. Blevins's public dissemination of this private information and the intimate photos of Ms. Read without her knowledge or consent has caused Ms. Read severe emotional distress, humiliation, and mental anguish, and damage to her overall well-being.

## COUNT IV

### Intrusion Upon Seclusion

196.     Ms. Read repeats and realleges the allegations in paragraphs 1 through 195 of the Counterclaim as if set forth in this Count.

197.     Without Ms. Read's knowledge or consent, Mr. Blevins accessed and transferred copies of intimate, private photos of Ms. Read that were stored on her personal cellphone and/or in her personal cloud storage to his own device.

198.     Mr. Blevins's access and transfer of Ms. Read's personal information, including intimate photos of her, from her personal cellphone and personal cloud storage when Mr. Blevins accessed them without Ms. Read's knowledge or consent would be highly offensive to a reasonable person and constitutes intentional intrusion in the private affairs of Ms. Read.

199.     Mr. Blevins's dissemination of Ms. Read's personal information, including intimate photos of her, that he obtained without Ms. Read's knowledge or consent would be highly offensive to a reasonable person.

200.     As a result of Mr. Blevins's intentional intrusion into the private affairs of Ms. Read, Ms. Read has suffered severe emotional distress, mental anguish, and harm to her overall well-being.

## COUNT V

### Breach of Contract

201.     Ms. Read repeats and realleges the allegations in paragraphs 1 through 200 of the Counterclaim as if set forth in this Count.

202.    On February 8, 2023, Mr. Blevins and Ms. Read entered into a Settlement Agreement in which they agreed, among other things, that they would have "zero contact with each other, either directly or through third parties," except for work-related purposes. The Settlement Agreement also prohibited "correspondence of a personal nature" between them. The Settlement Agreement also required that they "permanently delete any private photographs, video, or any other media of the other."

203.    Mr. Blevins breached the Settlement Agreement by creating his public website about Ms. Read that contained an "open letter" to Ms. Read, in violation of the prohibition against contact with Ms. Read and correspondence of a personal nature between them.

204.    Mr. Blevins breached the Settlement Agreement by failing to delete private photos or other media of Ms. Read, as evidenced by his display of a picture of him and Ms. Read on his website.

205.    On information and belief, Mr. Blevins also retained intimate photos of Ms. Read that he improperly transferred from her personal account.

206.    Mr. Blevins also breached the Settlement Agreement by continuing to contact Ms. Read, including through anonymous phone calls and voicemail messages.

207.    Mr. Blevins also breached the Settlement Agreement by attempting to create an OnlyFans page dedicated to Ms. Read where he intended to post intimate private photos of Ms. Read that he did not delete, despite his agreement to do so.

208.    At the time of Mr. Blevins's breach, Ms. Read had performed all of her obligations under the Settlement Agreement and was not otherwise in breach of the Settlement Agreement.

209.    As a result of Mr. Blevins's breach of the Settlement Agreement, Ms. Read has suffered damages, including to her reputation and to her overall well-being.

210.    Ms. Read also withdrew her then-pending Stalking Petition which she otherwise would not have withdrawn if she had known that Mr. Blevins would not abide by the terms of the Agreement.

## COUNT VI

### Battery

211.    Ms. Read repeats and realleges the allegations in paragraphs 1 through 210 of the Counterclaim as if set forth in this Count.

212.    On multiple occasions, Mr. Blevins engaged in nonconsensual sexual contact with Ms. Read.

213.    As recounted above, this included on July 22, 2022 in Maryland, August 26, 2022 in Boston, and October 19, 2022 in Maryland.

214.    On these occasions, Mr. Blevins forced Ms. Read onto a hotel room bed, got on top of her, removed her clothes, and engaged in sexual intercourse with her, without her consent and without any type of protection against sexually transmitted disease or pregnancy.

215.    Mr. Blevins's nonconsensual sexual contact with Ms. Read was harmful and offensive to Ms. Read and offended Ms. Read's personal sense of dignity.

216.    Mr. Blevins's nonconsensual sexual contact with Ms. Read caused her physical pain as well as humiliation, emotional distress, and mental anguish.

## COUNT VII

### False Imprisonment

217.    Ms. Read repeats and realleges the allegations in paragraphs 1 through 216 of the Counterclaim as if set forth in this Count.

218.    As detailed above, on multiple occasions, Mr. Blevins deprived Ms. Read of her personal liberty without her consent or legal justification.

219.    On July 22, 2022, Mr. Blevins pinned Ms. Read to her hotel bed, depriving her of her personal liberty as he proceeded to sexually assault her.

220.    On August 26, 2022, Mr. Blevins pinned Ms. Read to his hotel bed, depriving her of her personal liberty as he proceeded to sexually assault her.

221.    On October 17, 2022, Mr. Blevins grabbed Ms. Reed in her hotel room and deprived her of her personal liberty.

222.    On October 19, 2022, Mr. Blevins once again pinned Ms. Read to her hotel bed, depriving her of her personal liberty as he proceeded to sexually assault her.

223.    On December 2, 2022, Mr. Blevins once again grabbed Ms. Reed in his hotel room and deprived her of her personal liberty. He also blocked her attempt to leave by standing in front of the hotel elevator and refusing to let her enter the elevator.

224.    In all of these incidents, Mr. Blevins acted without Ms. Read's consent or any legal justification.

225.    Ms. Read was conscious of Mr. Blevins's preventing her from leaving the hotel rooms, preventing her from entering the hotel elevator, and detaining her against her will.

226.    Mr. Blevins's false imprisonment of Ms. Read caused her serious emotional distress, mental anguish, and damage to her overall well-being.


For these reasons, Ms. Read demands judgment against Mr. Blevins in an amount to be determined at trial as follows:

1.    compensatory damages in excess of $500,000;

2.    punitive damages in excess of $500,000;

3.    together with interest, costs, and such other relief as may be appropriate

under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant/Counter-Plaintiff

Jolene Read respectfully requests that all triable issues be tried before a jury.

February 23, 2024

Respectfully submitted,

*/s/Eric M. Rigatuso*
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
Attorney for Defendant/Counter-Plaintiff

*/s/David S. Wachen*
David S. Wachen (12790)
WACHEN LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121
Fax (301) 259-3846
david@wachenlaw.com
Attorney for Defendant/Counter-Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of February 2024, copies of the foregoing was served via the Court's ECF System to:

Dennis E. Boyle, Esquire
Boyle & Jasari
1050 Connecticut Avenue, NW
Suite 500
Washington, DC  20036
dboyle@boylejasari.com
*Counsel for Plaintiff/Counter-Defendant*

*/s/Eric M. Rigatuso*
Eric M. Rigatuso (27605)